WILMINGTON CITY RY. CO.

*v.*

PEOPLE'S RY. CO.

(Court of Chancery of Delaware.   Sept. 27, 1900.)

*Willard Saulsbury,* for complainant. *Benjamin Nields* and *William S. Hilles,* for respondent.

NICHOLSON, Chancellor: The complainant filed its bill in this cause on the 15th day of May, praying as follows: "That the said respondent, its successors, officers, employés, workmen, contractors, agents, deputies, and attorneys, may be restrained by the injunction of this honorable court from locating, constructing, operating, or maintaining a city railway within the city limits of the city of Wilmington, from cutting, tearing up, or removing the tracks of your orator, or any portion thereof, from hindering or delaying the operation of the cars over the lines of your orator, from interference with, cutting, or removing the trolley wires of your orator, or any portion thereof, and that a preliminary injunction be issued restraining said respondent and its successors, officers, employés, contractors, workmen, agents, deputies, and attorneys in like manner, until the further order of the chancellor." Upon presentation of the bill a rule was

issued returnable on the 23d day of May, requiring the respondent to show cause why the preliminary injunction prayed for should not be granted, with a restraining order until the determination of the rule. The respondent filed its answer on the 29th day of May, the hearing of the rule having been continued at request of counsel on both sides, and in June the motion for the preliminary injunction was argued upon bill, answer, and affidavits. Counsel for respondent then obtained leave to file supplementary briefs, and complainant's counsel to reply. These briefs were subsequently filed without oral argument, the last regular brief being submitted by the senior counsel for respondent on the 5th day of July.

The complainant alleges in its bill that under the provisions of its act of incorporation, passed February 4, 1864, entitled "An act to incorporate the Wilmington City Railway Company," being chapter 406, vol. 12, Del. Laws, it was granted the exclusive right and privilege of building and operating a city railway within the city limits of the city of Wilmington, and that it has constructed, and is now operating and maintaining, lines of city railway through and along the streets of the city of Wilmington, which, as set forth in its bill, aggregate many miles of railway. It further alleges (section 5) : "That under color of the provisions of the act of the general assembly entitled 'An act providing a general incorporation law,' approved March 10, 1899, a company known as 'People's Railway Co.' has attempted to acquire rights and franchises to build certain city railways in the city of Wilmington through and along the streets named in the resolution hereafter referred to, and has procured the passage by the street and sewer department of the city of Wilmington of a resolution of which a copy is hereto annexed, and marked 'Exhibit B.' That the alleged charter of the said People's Railway is illegal and void, as is also the pretended consent obtained from the street and sewer department of the city of Wilmington, and does not authorize or empower the said respondent to locate, construct, operate, or maintain a street railway or railways within the city limits of the city of Wilmington, and moreover impairs the obligation of the contract aforesaid between your orator and the state of Delaware." The respondent denies the exclusive right as alleged in complainant's bill,

and further alleges "that it is in all respects a legal and valid corporation existing under a legal and valid charter, and that the consent obtained from the said department is valid, and does authorize and empower it to locate, construct, operate, and maintain the street railways therein provided," and that none of the matters aforesaid in any way impair the obligation of any contract between the said complainant and the state of Delaware.

There are practically no issues of fact in this cause, but its decision involves the construction of the constitution of 1897 in a most important particular, and the interpretation of the general incorporation law above cited. The bill and answer raise some questions which were fully discussed and determined by this court upon motion for the preliminary injunction in the case of *Wilmington City Ry. Co. v. Wilmington & B.S. Ry. Co.,* argued by the same counsel who appear in this cause, and reported in 46 *Atl.* 12. The new issues to be determined are sufficiently raised, however, by the bill and answer, and have been discussed by counsel on both sides at great length, and with great earnestness. In the case to which I have referred, the Wilmington City Railway Company, which is also the complainant in this cause, prayed the court to restrain the Wilmington & Brandywine Springs Railway Company from entering the city of Wilmington or crossing the complainant's tracks. It was contended on the part of complainant that its charter gave it the exclusive right to locate, construct, and maintain a city railway in the city of Wilmington, and that the special act of the legislature incorporating the Wilmington & Brandywine Springs Railway Company, and authorizing it to locate, construct, and operate its railway in the city of Wilmington, was in violation of the constitution of the United States, and a mere nullity, being an interference with the vested rights of the complainant, an attempt to impair the obligation of the contract between it and the state of Delaware contained in its charter giving it the exclusive right. It also claimed that the Brandywine Springs Railway Company has forfeited whatever rights it might have possessed originally to enter the city. The first contention was considered at great length, and the authorities bearing upon the question were elaborately reviewed and analyzed, the conclusions arrived at being:

First. That, although the charter of the Wilmington City Railway Company did grant it the exclusive right claimed, yet the reserved power of revocation by the legislature contained in the constitution of 1831 "became a part of all charters subsequently granted, as if expressed in the instrument itself," and therefore became an essential element of the contract entered into between the state of Delaware and the Wilmington City Railway Company.

Second. That the "reserved power of revocation by the legislature means 'the power to revoke at the pleasure of the legislature any or all of the franchises granted to a corporation, the power to recall all the rights, privileges, or franchises granted to a corporation, or any number less than all, or any single right, privilege, or franchise'; that it cannot mean less than this, and that it cannot mean more, and that it differs from the reserved power 'to alter, amend or repeal the charter in not including the power to regulate or control corporations in the manner illustrated in the cases cited'; that the revocation may be either direct, or, as in the Georgia case cited (*West End & A. St. R. Co. v. Atlantic St. R. Co.,* 49 Ga. 158), 'by necessary implication by the passage of an act necessarily inconsistent with some right or privilege possessed by some existing corporation.'"

Third. That the legislature had expressly authorized the Wilmington & Brandywine Springs Railway Company, upon complying with certain conditions, to build its railways through certain specified streets of the city of Wilmington, and it therefore followed that this act "was an exercise pro tanto by the legislature of the power of revocation reserved to it by the constitution, and deprived the complainant of any exclusive right it might have had to the streets specified in said act as against the Brandywine Springs Company, leaving it in possession of all its other rights or franchises, only shorn of their exclusiveness." It appeared, however, in that case, that the Brandywine Springs Railway Company had failed to build its line, as required by its charter, within the time limited, so that, inasmuch as the charter provided that in such event the act should become void, and all the rights and privileges therein granted should wholly cease and determine, and this forfeiture clause being a self-operating one, the Wilmington & Brandywine Springs Railway Company had no

longer any right to enter the city of Wilmington. For this reason the Wilmington City Railway Company was granted the injunction prayed for.

This case, which I have deemed it necessary to cite at such length for the purpose of dispensing with the renewed discussion in the cause now pending of questions already carefully considered and decided, arose under a special charter and its supplements, granted while the constitution of 1831 was in force. The present cause arises under the general incorporation law passed in accordance with the provisions of the constitution in 1897, and the learned counsel for complainant, in order to indicate in general terms the questions which are now presented for determination by the court, quotes from the opinion in the former case the following sentence: "Under the present constitution the courts have yet to determine what effect the general incorporation act passed under the present constitution will have upon the exclusive rights contained in special charters granted under the constitution of 1831 by reason of the organization of corporations in accordance with its provisions, which possess powers inconsistent with such exclusive rights." Now, the People's Railway Company, the respondent, seeks to construct, maintain, and operate a railway for the transportation of freight and passengers by electricity, or any improved motive power other than steam, from the intersection of Lancaster Avenue and Greenhill Avenue, said point being in the boundary line of the city of Wilmington, thence along Greenhill Avenue and other streets (named in its articles of association) in the city of Wilmington to the right of way of the P., W. & B.R. Co.; and claims to possess the power so to do by virtue of its organization in accordance with the provisions of the general incorporation act. The rights claimed by it are essentially the same as those claimed by the Wilmington & Brandywine Springs Railway Company in the case cited, and in like manner are necessarily inconsistent with the exclusive right of the Wilmington City Railway Company, the complainant; so that there are now raised for the first time in any of the courts of this state two questions of great public interest, which are presented to this court by the case under consideration. They are: First. Does the reserved power of revocation by the legislature of

charters granted under the constitution of 1831 exist under the present constitution? Second. Has the general incorporation law passed in accordance with the provisions of the new constitution revoked the exclusive right of the Wilmington City Railway Company to construct and operate a city railroad in the city of Wilmington, by authorizing the incorporation of railways possessing rights necessarily inconsistent therewith? There are some subordinate questions presented in the briefs, but these two are the distinct and fundamental ones, which I will now proceed to consider in the order of their logical sequence, which is also that of their public importance.

Counsel for complainant contends that the state of Delaware has relinquished by the constitution of 1897 the reserved power of revocation by the legislature which formerly it possessed in the case of all charters granted under the constitution of 1831, and cites in his brief all of article 9 of the present constitution (the article concerning corporations) which in any way affects the question, and also section 14 of the schedule. I will here quote for convenience of reference as follows:

"Article 9, § 1. No corporation shall hereafter be created, amended, renewed or revived by special act, but only by or under general law, nor shall any existing corporate charter be amended, renewed or revived by special act, but only by or under general law; but the foregoing provision shall not apply to municipal corporations, banks or corporations sustained in whole or in part by the state. The general assembly shall, by general law, provide for the revocation or forfeiture of charters of all corporations for the abuse, misuse or nonuser of their corporate powers, privileges or franchises. Any proceeding for such revocation or forfeiture shall be taken by the attorney-general as may be provided by law. No general incorporation law, nor any special act of incorporation shall be enacted without the concurrence of two-thirds of all the members of each house of the general assembly.

"Sec. 2. No corporation in existence at the adoption of this constitution shall have its charter amended or renewed without first filing under the corporate seal of said corporation, duly attested, in

the office of the secretary of state an acceptance of the provisions of this constitution."

"Sec. 4. The rights, privileges, immunities and estates of religious societies and corporate bodies except as herein otherwise provided shall remain as if the constitution of this state had not been altered."

Section 14 of schedule: "Until the general assembly shall enact a general incorporation law as provided for in section 1 of article 9 of this amended constitution, existing corporations may be renewed for a period not exceeding four years, without change or enlargement of their corporate powers or duties, in a manner lawful before this amended constitution shall take effect."

The meaning and effect of these provisions cannot be intelligently discussed without a preliminary statement of those broad fundamental principles of constitutional law which on this point constitute the canons of construction. The rules by which we may measure the extent of the legislative authority and power in the states of the Union are laid down with admitted correctness by Judge Cooley (Const. Lim. [6th Ed.] p. 104) : "In creating a legislative department, and conferring upon it legislative power, the people must be understood to have conferred the full and complete power, as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may see fit to impose, and to the limitations which are contained in the constitution of the United States. The legislative department is not made a special agency for the exercise of specifically defined legislative powers, but is intrusted with the general authority to make laws at discretion,"—that is, the American state legislatures may exercise the legislative powers which the parliament of Great Britain wields, except as restrictions are imposed, although they are excluded from other functions, executive and judicial, which may be, and sometimes are, habitually exercised by the British parliament. A part of this general legislative power is the power to revoke or amend a corporate charter, and the limitation of the power is found in the inhibition to "impair the obligation of contracts" contained in the constitutional limitations of

the powers of the states, and first applied to corporate charters by the United States Supreme Court in the Dartmouth College Case. The evolution of this doctrine through a long series of Supreme Court decisions was shown in the case above cited (*Wilmington City Ry. Co. v. Wilmington & B.S.R. Co.*), and that a reserved power of revocation contained in a constitution, became a part of all subsequent charters, as if written in the charters themselves ipsissimis verbis. The charter of the Wilmington City Railway Company, therefore, being a contract between the state of Delaware and the company, and the reserved power of revocation by its legislature being a part of the contract, the right to revoke by the legislature became a vested right of the state, of which no legislature could devest it, and of which it could be deprived only by some subsequent constitutional provision relinquishing or taking it away either explicitly or by necessary implication. In the absence of such constitutional relinquishment, or some constitutional inhibition, the legislature might revoke under its general powers as an American legislature, and the corporation could not plead the inhibition of the United States constitution to impair the obligation of contracts because it was a part of the very contract with the state to be pleaded that the legislature might in its discretion revoke.

It only remains to examine in the light of these principles those provisions of the present constitution which I have quoted. The first clause of section 1 provides that "no corporation shall hereafter be created, amended, renewed or revived by special act, but only by or under general law, nor shall any existing corporate charter be amended, renewed or revived by special act, but only by or under general law." This expressly prohibits the legislature from amending, renewing, or reviving any existing charter by special act, but does not prohibit expressly their revocation; and the question obviously arises whether the expression of "amend, renew, or revive," in the prohibiting clause, and the omission of "revoke," should not be construed to be an exception of the revocation of charters from the prohibition, so as to leave to the legislature unimpaired the power to revoke by special act as well as by general law. It may also be noted that the power to revoke is the only contract power possessed by

the state. But that question is not now before me to decide, and so far there is certainly nothing which any amount of ingenuity could construe into a prohibition to revoke by general law; for, whatever other construction may be placed upon this clause, it certainly cannot be construed to mean a prohibition of any conceivable legislative action by general law in relation to corporations. It is the next clause, however, upon which the learned counsel seem mainly to rely, and it is as follows: "The general assembly shall, by general law, provide for the revocation or forfeiture of charters of all corporations for the abuse, misuse or nonuser of their corporate powers, privileges or franchises. Any proceeding for such revocation or forfeiture shall be taken by the attorney-general as may be provided by law." The learned counsel for complainant contends that from this arises the implication that the contract right of the state to revoke by its legislature in their discretion is relinquished, and that there is substituted the right to provide proceedings to be taken by the attorney general for the revocation or forfeiture of charters for abuse, misuse, or nonuser. Is it possible, however, to extract from this clause any meaning but the plain and obvious one that it is a direction to the legislature to regulate by statute a jurisdiction already existing at common law, whereby charters are forfeited for abuse, misuse, or nonuser by proceedings in quo warranto, or information in the nature of quo warranto, instituted in the courts at the discretion of the attorney general? Until the legislature sees fit to pass a statute regulating this jurisdiction, which has existed in England "time whereof the memory of man runneth not to the contrary," proceedings for the forfeiture of charters for misuse, abuse, or nonuser, as well as other causes, will continue to be instituted by the attorney general before our superior court in accordance with common-law precedent, as in the case of *State v. Hancock, (Del. Super.)* 45 *Atl.* 851, which was an information in the nature of a writ of quo warranto, brought October 24, 1899, and finally decided December 18, 1899.

The American theory of these proceedings is expressed in a Pennsylvania case, in which the court, after making several citations from the United States Supreme Court, speaks as follows: "It is a tacit condition of incorporation that the grantees shall act up to the

end or design for which they were incorporated; and hence, through neglect or abuse of its franchises, a corporation may forfeit its charter as for condition broken, or for a breach of trust." "Where there has been a misuser or a nonuser in regard to matters which are of the essence of the contract between the corporation and the state, and the acts or omissions complained of have been repeated and willful, they constitute a just ground of forfeiture." Although in modern times these proceedings have come to be regarded as a purely civil remedy, yet they partake in some of their forms and incidents of the nature of criminal process, and there are certain analogies to a criminal prosecution. Forfeiture of life is the judgment of the court upon a man tried and convicted of murder in the first degree; forfeiture of corporate life is the judgment in case a corporation be convicted upon information in the nature of quo warranto of misuse, abuse, or nonuser of its corporate franchises. A review of the origin, rise, and development of the proceedings in quo warranto and information in the nature of quo warranto in the English law would make these points more clear, but this has been done so frequently by modern treatise writers that it is unnecessary to do more than refer to the condensed, and at the same time adequate, review given by Mr. High in his work on Extraordinary Remedies (chapter 13), and by Mr. Thompson in chapter 157, vol. 5, of his work on Corporations. It is manifest that the makers of our present constitution, in directing the legislature to regulate such proceedings by statute, only adopted the practice prevailing in most of our sister states, which have seen fit in this as in many other matters to relieve their judges and lawyers from the necessity of a laborious examination and analysis of common-law precedent for the determination of the many points that arise under the conditions of modern life, by attempting to regulate it all in the statute book. These considerations seem to make it clear that this clause has no possible reference to the reserved power of revocation by the legislature, and no inference can be drawn from it which would deprive the state of its vested right under the charter to revoke in whole or in part, in the discretion of the legislature, the charters of corporations incorporated under the constitution of 1831.

The remaining clauses quoted explain themselves, and really require no comment. Section 4 reads: "The rights, privileges, immunities and estates of religious societies and corporate bodies, except as hereafter provided, shall remain as if the constitution of this state had not been altered." This assuredly means simply that no change is intended to be made in the contract between the state and existing corporations; least of all a change which would at a single blow convert all these revocable charters into irrevocable ones, and leave the state of Delaware almost, if not quite, alone among her sister states, stripped of this, the only protection a state can have "against improvident grants or privileges which are afterwards seen to be oppressive or injurious to the public, or are so altered in practical effect by changes consequent upon unforeseen conditions as to become so." The present constitution contains no such reservation of power with reference to corporations to be created under its provisions, but that is left to the legislature, and is to be looked for in the general incorporation law. It will be for the courts to determine how far, and with what effectiveness, it has been provided for.

Having thus examined minutely every clause in the present constitution that could by any ingenuity be claimed to justify the contentions of complainant's counsel. I am brought irresistibly to the conclusion that the reserved power of revocation by the legislature of the charter of the Wilmington City Railway Company, which, as has been seen, included the power to revoke its exclusive features alone, leaving its other franchises intact, exists under the present constitution; that is, when exercised by general law, which is claimed by respondent's counsel to have been done by the general incorporation law, and the organization under it of the People's Railway Company.

I am now brought to the consideration of the second question: "Has the general incorporation law, passed in accordance with the provisions of the present constitution, revoked the exclusive right of the complainant, the Wilmington City Railway Company, to construct and operate a city railway in the city of Wilmington, by authorizing the incorporation of railways possessing rights necessarily inconsistent therewith?" And I shall consider with it the further ques-

tion whether the articles of association of the respondent, the People's Railway Company, are warranted by the provisions of the general incorporation law, and whether the respondent has complied with all the requirements of the statute. The contention of complainant's counsel is that there is no express provision in the general incorporation act authorizing the incorporation of street railways; that there is only an implication that it may have authorized it by the use of some phrases in sections 117 and 123; that nowhere is any express authority given to lay railways longitudinally along the streets, and that no public body is authorized to give a legal consent to any company organized for such purpose; and, after citing and analyzing the above-mentioned sections, his argument is summed up in his brief as follows: "To uphold the defendant's contention, you must imply from the sections cited, first, a grant of the right to organize such a corporation; second, the grant to the municipality to consent to the occupation of its streets; and then from these two implied grants imply the revocation of actually existing vested rights." Respondent's counsel contend that it is evident from the general scope and antecedent circumstances of the act that it provides for the incorporation of street-railway companies, and also that there is a strong implication from the sections cited, which are as follows:

"Sec. 117. The provisions of section 84 of this act shall be applicable to all railways that may be located and constructed under this act elsewhere than on turnpikes, highways or public roads."

"Sec. 123. That no railway shall be authorized or empowered hereunder, nor shall any consent or authorization of any board of officers, city, county or hundred, be held to authorize any railway to be constructed, maintained or operated upon any street upon which any track is now laid."

One of respondent's counsel also cites from section 112 the express grant of the right "to construct, maintain, and operate a railway with a single or double track, with such side tracks, turnouts, offices, stations, and depots as they may deem necessary at and between the points named in the articles of association," and then contends that this is not qualified by the following words, "commencing

at or within and extending to or into any town, city, or village named as the place of terminus," but in itself confers the right. Complainant's counsel omits any reference to this last citation, or to any portion of section 112. Respondent's counsel also insists strongly upon the power of the street and sewer department to grant to respondent the right to use the streets named in its articles of association.

One of the principal duties of courts of justice is the interpretation of statutes, and, however self-contradictory, incomplete, ungrammatical, or obscure the statute may be, it is none the less the imperative duty of the court to construe it; and it is also its duty to put upon it a construction which will render it operative, rather than inoperative, whenever such construction does not conflict with other accepted canons of construction. And it may not be amiss for me to observe in this connection that perhaps it might have caused American legislatures in general to exercise more care in the drafting of statutes, and might have been much better for the public in the long run, if the courts in general had been less astute to find amid the incoherences and deficiencies of badly-compounded statutes a meaning in accord with what was understood to be the general intent of the legislative mind at the time the act became a law. In the interpretation of statutes there is no canon of construction more inflexible, subject to certain obvious limitations, or more thoroughly well established, than this: "That where the terms of a statute which has received a judicial construction are used in a later statute, whether passed by the legislature of the same state or country or by that of another, that construction is to be given to the later statute." *Suth. St. Const.* § 333. A multitude of cases are cited in support of this in 23 *Am. & Eng. Enc. Law,* pp. 433, 434, where the proposition is stated in the text in the following language: "Congress or a state legislature, in adopting an English statute, is deemed to have adopted also the construction put thereon by the English courts. The same rule applies where the statute of one state has been adopted by the leigslature of another." Chief Justice Marshall says in *Cathcart v. Robinson,* 5 *Pet.* 280, 8 *L.Ed.* 126: "The rule which has been uniformly observed by this court in construing statutes is to adopt the construction made by the courts by whose legislature the statute was

enacted." Where there is a portion adopted, the Supreme Court says: "So far as Congress, in the act to regulate commerce, adopted the language of the English traffic act, it is to be presumed that it had in mind the construction given by the English courts to the adopted language, and intended to incorporate it into the statute." *Interstate Commerce Commission v. Baltimore & O.R. Co.,* 145 *U.S.* 263, 12 *Sup.Ct.* 844, 36 *L.Ed.* 699. The decisions applying this to the states of the Union are too numerous to cite, so that I have referred above to the long list cited in the American and English Encyclopaedia of Law, which also contains the state cases which limit its application.

In view of this rule of construction I have searched the general incorporation acts of other states, to ascertain what, if any, statute or portion of statutes have been adopted, and have carefully read and reread the general incorporation acts of New Jersey as they existed at the time our general incorporation act was passed. They are collected and published in the General Statutes of New Jersey 1709-1895, as follows: Corporations, with all supplementary and amendatory acts (volume 1, pp. 904-995); railroads and canals, with the supplementary and amendatory acts (volume 2, pp. 2635-2719); and street railways (volume 3, pp. 3207-3248). I find, by a critical comparison of our general incorporation act with these statutes, section by section, that no provisions whatever of the statutes specifically providing for street railways have been adopted by our legislature. But there is comparatively little in our statute which is not taken with slight or no change of verbiage from the great multitude of elaborate and minute provisions and regulations contained in the other New Jersey acts above referred to. The portions omitted, it may be observed, are very greatly in excess of the portions adopted. In that part of our statute which is concerned with railroad corporations the sections adopted from the New Jersey statutes are enacted almost in ipsissimis verbis, and the same sections, or most of them, are then repeated, with some such slight changes as making the width of roadway 40 instead of 60 feet in width, in that part of our statute concerning railways, which are defined by section 125 to be roads "the cars, carriages and coaches on which are propelled by electricity, by cable, motor or by any improved motive power other than steam." This is

of course the part of the act applying specifically to the case at bar, and all the contentions of complainant's counsel rest upon this part of the act, invoking for its interpretation that fundamental principle controlling the construction of corporate charters that there can be no doubtful grant, and citing the cases in which this principle has been emphatically stated by this court.

Now, it is not questioned that the respondent has complied with all the formal requirements of the law, and has been duly organized, but it is contended that its articles of association above cited are void and inoperative, because they contain what is not authorized by the general incorporation law. In the case of *Oregon Ry. & Nav. Co. v. Oregonian Ry. Co.,* 130 *U.S.* 25, 9 *Sup.Ct.* 413, 32 *L.Ed.* 841, Mr. Justice Miller, delivering the opinion of the court, says: "It is argued that the articles of association under the Oregon law, and the memorandum of association under the 'companies act of Great Britain' are themselves the equivalent of an act of incorporation by the legislature, and that whatever is found as a grant of power or description of the purpose of the company set forth in such articles of memorandum is tantamount to a legislative act." "A phrase in the opinion of the court in *Thomas v. Railroad Co., supra,* is cited as supporting this proposition, namely, 'the memorandum of association, as Lord Cairns said, stands in place of a legislative charter.' But what was meant, both by Lord Cairns and this court, was that anything not claimed, granted, or described in such instrument in relation to the powers and business of the corporation could not be held to be a part of them by construction; in other words, that its powers could not exceed those enumerated therein. It was necessarily implied in such remark that anything in such articles or memorandum not warranted by the statutes in question authorizing the formation of corporate bodies, was void for want of authority." This admirable definition of the scope and effect of articles of association under general corporation acts makes it clear that we must look only to our general incorporation law for authority for what is contained in the respondent's articles of association.

The ground is now made clear for the examination of the language of the statute itself, so far as it is put in question by the case

before me. In the first place, section 103 provides for the formation of companies for the purpose of "constructing, maintaining and operating a railway for the transportation of freight and passengers, the carriages, coaches and cars of which to be moved by electricity, by cable or motor, or by any improved motive power other than steam," and specifies what the articles of association shall contain; one being the statement of "the place from which and to which such railway is to be constructed, maintained and operated." Then, in section 112, it provides "that any railway constructed under the provisions of this act shall not exceed 40 feet in width," etc., "and when the route or routes of such railway and the location or locations of all other works, buildings, conveniences, appurtenances and appendages thereof shall have been determined upon and the survey of such route or routes deposited in the office of the secretary of state, then it shall be lawful for every such corporation formed under this act, upon payment or tender of such compensation as hereinbefore provided by its officers, agents, engineers, superintendents, workmen and other persons in their employ, to construct, maintain and operate a railway with a single or double track, with such side tracks, turnouts, offices, stations and depots, as they may deem necessary at and between the points named in the articles of association, commencing at or within and extending to or into any town, city or village named as the place of terminus," and then provides for the construction of branches, and "for the conveyance of passengers and freight to and from the termini thereof by motive power other than steam." A deposit with the state treasurer of $500 per mile is required by the same section. Powers of condemnation are given in section 111. Crossing of streets and highways is regulated by section 113, and of railways and railroads in section 114. Section 123 is that no railway shall be authorized or empowered thereunder, nor shall any consent or authorization of any board of officials, city, county, or hundred, be held to authorize any railway to be constructed, maintained, or operated upon any street upon which any track is now laid. Section 117 is: "The provisions of section 84 of this act shall be applicable to all railways that may be located and constructed under this act elsewhere than on turnpikes, highways and public roads." Now, whatever may be implied as to the general legislative intent from the last two sections cited, it is

plain, in view of this analysis of the statute, that the express grant of the power to construct and operate an electric railway within the limits of the city of Wilmington—a grant necessarily inconsistent with, and hence a revocation of, the exclusive right of the complainant therein—must be found, if at all, in the above citation from section 112. Section 112 of our general incorporation law is the same as section 11, as amended by section 83, of the New Jersey railroad act, to be found on page 2660 of the General Statutes of New Jersey, 1709-1895 (except, of course, that the New Jersey act applies to railroads operated by steam), with only a grammatical variation in the special clause requiring construction; a variation which can best be made plain by quoting the same clause in both. In our act it reads, "At and between the points named in the articles of association, commencing at or within, and extending to or into, any town, city or village named as the place of terminus." In the New Jersey act it reads, "Between the points named in the articles of association commencing at or within and extending to or into the town, city or village named as the place of the termini of such road." And in the same sentence a provision in relation to branches reads in our law, "And for the conveyance of freight and passengers to and from the termini thereof," while in the New Jersey law it reads, "And for the conveyance of passengers and freight to and from the terminus thereof." A note appended to this section of the New Jersey statute is as follows: "Both terminal points of a railroad constructed for the purpose of forming connection between existing roads may be in the same town or village. *Long Branch Com'rs v. West End Line R. Co., 29 N.J.Eq. 566.*" And "a railroad constructed under the general railroad law may lawfully occupy a public highway to the extent of a reasonable necessity." *Id.* Now, it appears from the articles of association filed by the respondent, and already cited, that both terminal points of this railway are in the City of Wilmington, and that it proposes to occupy the streets of the city between its point of beginning at the boundary line of the city to its point of termination at the right of way of the P., W. & B.R. Co. It follows, therefore, that unless section 112, taken in connection with all the other provisions of the general incorporation act, can be construed to warrant the formation of railway corporations possessing the power to construct and operate an electric railway beginning and

ending within the same town, city or village, and to occupy its streets, under the conditions existing in this case, then the respondent's articles of association are not warranted by law, and the complainant is entitled to the injunction prayed for. Can this court give to the language used such a construction? The answer is it must give that construction if it should clearly appear that the legislature has adopted the language of the New Jersey act, and that the courts of New Jersey have given such a construction to the adopted language; for in that event the rule of construction would be as expressed in the Supreme Court case cited, viz. *Interstate Commerce Commission v. Baltimore &O.R. Co.,* and "it would be presumed that the legislature had in mind the construction given to the adopted language by the New Jersey court, and intended to incorporate it into the statute." If such be the case, the use of such language by our legislature would be rationally explained. It may be noted here that no track is now laid upon any of the streets named in respondent's articles of association. Instead of first discussing, therefore, our general incorporation law, with a view to ascertain the principles and precedents which would otherwise guide this court in putting a construction upon it, it becomes necessary to ascertain first what construction has been given to this crucial clause of section 112 by the New Jersey courts, and, if it should further appear to be adopted language within the meaning of the rule, the construction of the New Jersey courts must be followed, regardless of what would otherwise be the judgment of this court.

In the case cited in the note to the New Jersey statute (*Long Branch Com'rs v. West End Line R. Co.*) the court construes the peculiar language of this clause as follows: "The language which furnishes the basis of the first ground taken by the complainant is found in the eleventh section. That section authorizes a corporation formed under the act to construct railroads between the 'points named in its articles of association, commencing at or within, and extending to or into, any town, city or village named as the place of the termini of such road.'" It is contended that these words plainly mean that each terminus must be at or within a different town, city, or village; in other words, that the road must commence at or within one town, city, or village, and extend to or into another town, city, or village.

The direction is in the disjunctive. The road must commence either at or within, and extend either to or into, a town, city or village. A road commencing at a point in the western boundary of the city of Newark, and extending to the city hall, would be located strictly in accordance with the letter of the act; it would commence at a city and end at a city. It is true it would not commence at one city and extend to or into another, but the law does not say that it shall, but simply that it shall commence at and extend into a city. I am unable to see a plain design in these words to restrict the termini of a road constructed under this act to two different towns, cities, or villages. Section 23 of the New Jersey act contains a provision not adopted by our act, as follows: "That companies whose roads shall be constructed under this act shall have the right to connect their roads with any railroad within this or any other state upon such terms as may be agreed upon," etc. In the case which I have cited the road whose right was in dispute connected with other roads, and the learned vice chancellor gives weight to this provision in another portion of his opinion. Later, however, in the case of *National Docks Ry. Co. v. Central R. Co.,* 32 *N.J.Eq.* 767, the court of errors and appeals, on appeal from the court of chancery, held as follows: "Another objection raised is that the general railroad law does not authorize the construction of a railroad which shall lie wholly within one city, as will the railway now enjoined. But upon this point we concur in the opposite views expressed by the learned vice chancellor in *Long Branch Com'rs v. West End Line R. Co.,* 29 *N.J.Eq.* 566." If we remember that the evil which called forth this enactment was the incessant application to the legislature for special charters for all sorts of railroads, it will plainly appear to be our duty to construe it liberally with respect to the classes of railroads which may be built under it; and, as the vice chancellor shows, only a constrained and partial interpretation could lead to the conclusion of the complainant. We find no reason in the law to believe that the legislature had it in mind to exclude this class of railroads. This is a final and authoritative construction of the clause, and seems to be made without any reference to section 23, nor does any inference seem to be drawn from that section. The construction put by the New Jersey courts upon the right to use highways is correctly stated in the note to this section in

the statute which I have cited, and is expressed in the case from which I have already quoted, to wit, *Long Branch Com'rs v. West End Line R. Co.,* as follows: "It cannot be doubted that the defendants, in the construction of their road, have a right to occupy the highway to the extent of a reasonable necessity. *Morris & E.R. Co. v. Mayor, etc., of the City of Newark,* 10 *N.J.Eq.* 352; *Attorney General v. Morris & E.R. Co.,* 19 *N.J.Eq.* 386; *Newark & N.Y.R. Co. v. Mayor, etc., of City of Newark,* 23 *N.J.Eq.* 522. Such right may arise by implication." The cases cited by the learned vice chancellor are concerned with the occupation of city streets, and it is obvious that it is difficult to imagine a case in a level country where "a reasonable necessity" could arise to use a country highway between termini, instead of using the power of condemnation to cross farm lands; while, on the other hand, the grant of power to enter into or pass through a closely-built city, such as Newark or Wilmington, would be practically nugatory unless it carried with it the right to occupy city streets, for the only alternative would be the condemnation of a right of way through solid blocks of buildings, which would involve a wholesale destruction of property and a waste of capital, rendering it in any but most exceptional cases an impossible one. Hence the reason for the inference of a "reasonable necessity" for the use of city streets in the case of such grants. The general principles controlling this application of the doctrine of necessary implication are discussed by Chief Justice Shaw with his usual force and felicity in the case of *Inhabitants of Springfield v. Connecticut R.R. Co.,* 4 *Cush.* 72.

The citations I have made are sufficient to show the construction put upon this clause by the New Jersey courts in the two essential points, and it only remains to consider whether there is anything contained in our general incorporation law which tends to rebut the presumption that the legislature, in adopting this language of the New Jersey act, had in mind the construction given to the adopted language by the New Jersey courts, and intended to incorporate it into the statute. The fact that in our own statute this clause applies to electric railways, while in the New Jersey act it concerns steam railroads, strengthens the presumption materially, for the reasoning considered sufficient by the New Jersey courts in the case of steam

railroads would apply, a fortiori, to electric railways, or those operated by any improved motive power other than steam; these being now in general use on city streets, and being, as operated at present, almost universally held to impose no additional burden upon public streets or highways. The use of the singular of the word "terminus" in our act, instead of the plural, as in the New Jersey act, is plainly immaterial, since the context shows that the plural is meant, and in such cases the familiar rule of construction is that the singular includes the plural. There must, of necessity, be two termini, and the use made of the plural in the same sentence further on makes it plain that the use of the singular is merely a clerical error. In addition to these considerations, the inference is strong from sections 117 and 123, already twice quoted, that the use of the city streets, and of highways and turnpikes under some circumstances, was contemplated by the legislature. The clause forbidding any city authority to authorize the use of streets upon which tracks are already laid would be utterly meaningless unless the legislature intended that in other cases they might have power to authorize the occupation of streets upon which tracks were not laid; and although this inference would, of course, be insufficient to confer the power, it is material in strengthening the presumption.

Again, the New Jersey court of appeals, in the case above cited of *National Docks Ry. Co. v. Central R. Co.,* gives as a reason for their admittedly liberal construction that "the evil which called forth this enactment was the incessant application to the legislature for special charters for all sorts of railroads"; and it is assuredly a matter of public knowledge in this state that the incessant application to the legislature for all sorts of electric railway charters was the evil which called forth the enactment of that part of our general incorporation law which provides for the incorporation of electric railways. Nor is it immaterial that prior legislatures have repeatedly granted charters specially authorizing electric railways to be constructed and operated in the city of Wilmington, as in the Case of the Brandywine Springs Railway Company, already referred to; for this indicates the general policy of our state legislation in this respect.

It follows, therefore, that our general incorporation law as a whole and the general policy of our legislation favor, rather than rebut, the presumption that the legislature, in adopting the language of the New Jersey statute, had in mind the construction given to it by the New Jersey courts, and intended to incorporate it into the statute; and it has been shown already that their construction of the language sustains the contention of respondent that its articles of association are warranted by the general incorporation law. So, in view of all the considerations I have adduced, I am led finally to the conclusion that the general incorporation law authorizes the organization of corporations possessed of the powers set forth in the respondent's article of association,—powers necessarily inconsistent with the exclusive rights conferred by complainant's charter,—and that its charter is so far revoked, leaving it possessed of all its other franchises, only shorn of their exclusiveness.

It only remains to consider the contention of complainant's counsel that "the pretended consent of the street and sewer department, under color of which the respondent assumes to act, is invalid, void, and of no effect: (a) Because that body had no authority to give it; (b) because the mayor did not sign it." With regard to the second ground of this contention, it appeared upon the argument of the cause that the mayor had signed it. With regard to the first ground, it is only necessary to state that the statute, in section 113, expressly provides that, in case any railway organized under the act shall cross any street in any city or incorporated town, it shall be either above or below grade, etc., with the proviso, however, that "the council of any city, or the commissioners of any incorporated town, or other persons having authority or control over said highways and streets respectively, may grant permission to said corporation to cross such street or streets, highway or highways, within the limits of the respective city or incorporated town at grade." Now, this unquestionably gives to the street and sewer department of the city of Wilmington complete control of the crossing of streets at grade by the respondent, and thus enables it to control indirectly the manner in which it shall use the streets between crossings, since it manifestly makes the use of the streets at grade practically dependent upon its consent; for it might

enforce compliance with any conditions it should see fit to impose in good faith by a refusal to permit street crossings at grade by the railway seeking to use the streets. But, apart from this explicit provision, it is apparent from all that has been before said and cited that there is no basis for any objection which the complainant has standing in this court to make which could involve a consideration by the court of the street and sewer department's power to consent. As has been stated already, the crossing of complainant's railway is provided for expressly in section 114, and must be by agreement, or, failing that, by condemnation proceedings in the manner prescribed by section 78.

There is one other contention which was made by complainant's counsel, namely, that the street and sewer department having once granted to the complainant the right to use Sixth street, it is estopped from granting such right to another railway, inasmuch as it became vested in the complainant. Now, without making any comment upon the relevance of this argument, I may state that an examination of the authorities will show beyond question that such a consent as the one set forth by complainant only becomes irrevocable when so acted on by the beneficiary as to involve substantial expenditure and cause real loss if recalled; and this does not appear to have occurred in the present case. The motion for a preliminary injunction is denied, and the restraining order heretofore issued is dissolved.